FILED: BRONX COUNTY CLERK 07/25/2024 09:26 AM
NYSCEF DOC. NO. 2
INDEX NO. 811722/2024E
RECEIVED NYSCEF: 07/25/2024

24-11350-jpm    Doc 47-1    Filed 07/23/25    Entered 07/23/25 11:57:59    Exhibit a
Pg 1 of 15

# EXHIBIT A

Contract / JV AGREEMENT

FILED: BRONX COUNTY CLERK 07/25/2024 09:26 AM
NYSCEF DOC. NO. 2
INDEX NO. 811722/2024E
RECEIVED NYSCEF: 07/25/2024

24-11350-jpm    Doc 47-1    Filed 07/23/25    Entered 07/23/25 11:57:59    Exhibit a
Pg 2 of 15

# JOINT VENTURE
# DEVELOPMENT AGREEMENT

**THIS JOINT VENTURE DEVELOPMENT AGREEMENT** (the "Agreement") is effective as of the 17th day of March 2023 by and between **CHANGAR REALTY CORP.**, a New York corporation having an address at 1704 Dr. Martin Luther King Jr. Blvd, First Floor, Bronx, N.Y. 10453 ("Changar and/or Owner"), and **DIAZ & ASSOCIATES REALTY, INC** ("Diaz & Ass."), a New York corporation and **KARSON DEVELOPMENT GROUP LLC** ("Karson", and together with "Diaz & Ass.", the "Developer"), a New York limited liability company authorized to transact business in the State of New York having a principal place of business located at 8 Duck Pond Road, Alpine, NJ 07620 (Owner and Developer herein collectively referred to herein as the "Parties", and/or the "JV Parties").

**WHEREAS**, the Owner hereby agrees to enter into an agreement to sell and develop the real property known or otherwise located at 1704 University Avenue, which has been designated Block 2876, Lot 102 on the Tax Map of the City of New York (the "Property"), County of Bronx, in exchange for the consideration herein listed.

**WHEREAS**, Developer hereby agrees to acquire the Property for the purpose of developing a multifamily residential real estate project of approximately 70-90 residential units and community facility space for rental partly to low income individuals and families, seniors, or certain populations in need of supportive housing, as qualified by New York City's Department of Housing Preservation and Development ("HPD") term sheets in order for the project to qualify for the maximum available construction and permanent financing sources, and to maximize the most of income for the project (the "Project"); and

**WHEREAS**, in contemplation of the planned acquisition and construction financing for the Project, the JV Parties intend to form a joint venture entity to be the fee owner or beneficial owner of the Property, or part owner thereof through their respective entities, subsidiary or affiliated single purpose entities, as the case may be; and

**WHEREAS**, for mutual consideration, the receipt of which is hereby acknowledged, the Parties desire to enter into this Agreement to delineate the Parties' contributions, obligations and responsibilities in respect to the joint venture and the Project, including but not limited the predevelopment, construction and permanent financing for the Project, which may include either low income housing tax credits, or other similar affordable housing subsidies provided by either the State of New York or City of New York, private equity or debt sources (the "Joint Venture"); and

623526

FILED: BRONX COUNTY CLERK 07/25/2024 09:26 AM
NYSCEF DOC. NO. 2
24-11350-jpm    Doc 47-1    Filed 07/23/25    Entered 07/23/25 11:57:59    Exhibit a
Pg 3 of 15
INDEX NO. 811722/2024E
RECEIVED NYSCEF: 07/25/2024

**WHEREAS**, Developer is, among other things, engaged in the business of acquiring and assembling real estate for the purpose of developing low-income and market rate housing in the State of New York, and providing capital for real estate development Projects; and

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree to the following:

1. **OBLIGATIONS**.

   a. **Developer's Obligations**. Developer will provide development services reasonably necessary to complete the Project, which shall include the following:

   i. Make Developer's financial contribution to the Project. For purposes of this Agreement Developer's contribution shall be as follows:

   a) Fifty Thousand Dollars ($50,000.00) non-refundable deposit payable to Owner upon execution of this Agreement, plus

   b) Fifty Thousand Dollars ($50,000.00) payable to Owner upon submission of Architectural drawings accepted by HPD or appropriate funding or regulatory State or City Agency; plus

   c) Fifty Thousand Dollars ($50,000.00) payable to Owner upon the Project being approved by HPD or appropriate funding or regulatory State or City Agency, and an Agency soft commitment letter is issued for the Project;

   d) Six Hundred Thousand Dollars ($600,000.00) payable to Owner upon the acquisition and construction loan financing for the Project.

   e) Payoff the current outstanding mortgage recorded against the Property, currently approximately Two Million Five Hundred Thousand Dollars ($2.5 million).

   -With the exception with the non-refundable deposit refenced in above all sums paid to Owner prior to the acquisition of the Property shall be treated as contract deposits by Developer as a contract vendee, and shall become liens against the Property and enforceable as liens against the Property in accordance with law.

   *Do these liens ride through?*

   ii. Pay for the pre-development expenses of the Project;

   iii. Take all steps commercially and reasonably required on its part to

2

FILED: BRONX COUNTY CLERK 07/25/2024 09:26 AM
NYSCEF DOC. NO. 2
24-11350-jpm    Doc 47-1    Filed 07/23/25    Entered 07/23/25 11:57:59    Exhibit a
Pg 4 of 15
INDEX NO. 811722/2024E
RECEIVED NYSCEF: 07/25/2024

facilitate the closing of the acquisition of the Property;

iv. Facilitate and complete all due diligence activities and pre-development activities of the Project, including but not limited to performing or causing the performance of all market analysis, feasibility studies, zoning analysis, environmental studies, Project budgets (pro-forma), architectural plans, and pre-development financing for the Project;

v. Select and negotiate the Project's professionals including but not limited to the Project's attorneys, architects, general contractors, accountants, construction managers, management company(ies), lobbyist, and other consultants;

vi. Negotiate agreements for architectural, engineering, testing, or development consulting services for the Project, and any agreements for the construction of any improvements to be constructed for the Project or the furnishings of any supplies, materials, machinery, or equipment required;

vii. Work with the architect to develop the Project's plans and specifications, with property design issues being ultimately approved by HPD or appropriate State or City regulatory Agency providing oversight or funding for the Project;

viii. Negotiate a construction contract with a third party general contractor;

ix. Negotiate agreements with other equity investors for the Project, including syndicators;

x. Coordinate communication with the construction manager and/or Owner's Representative selected for the Project;

xi. Work with the management team assembled for the Project to ensure timely lease-up and stabilization of the Project;

xii. Execute, cause the execution of the financing guaranties for the Project at market;

xiii. Interface and lead all communications and submissions to the proper State or City Agencies participating or contributing to the Project;

xiv. Open and maintain all bank accounts for the JV Entity;

xv. Form or cause the formation of the JV Entity;

xvi. Assist with lenders and equity partners on Project related financing

3

FILED: BRONX COUNTY CLERK 07/25/2024 09:26 AM
NYSCEF DOC. NO. 2

24-11350-jpm    Doc 47-1    Filed 07/23/25    Entered 07/23/25 11:57:59    Exhibit a
Pg 5 of 15

INDEX NO. 811722/2024E
RECEIVED NYSCEF: 07/25/2024

throughout the total development period for the Project, including negotiating terms with the financing entities and administering due diligence responses for such entities.

b. **Owner Obligations**. Owner will provide the following:

  i. Contribute the Property with clear title to the SPE upon and together with the construction financing for the Project. It is expressly understood by the Parties that Owner's only contribution to the Project shall be the Property;

  ii. Continue to maintain and carry the Property's expenses, including the timely payment of the Property's mortgage, real estate taxes, insurance, and utilities. If Owner shall default in the payment of the Property's carrying expenses, Owner hereby designates and gives all authority and power necessary to Developer to manage the Property as Owner's authorize agent, and take all actions required in furtherance thereof at Developer's sole discretion, including but not limited to re-financing the Property's mortgage debt, and to make such outstanding payments. This also includes the collection of rents from the Property's tenants, the commencement of eviction proceedings if required (with the costs of collection, including reasonable attorney's fees to be advanced by Developer and to be reimbursed to Developer as set forth in this Agreement), and refinancing closing costs, among others. In furtherance thereof, Owner shall hereby agree to execute such documents and notices as shall be commercially required to affect collection of rents. Any sums advanced by Developer for payment of Owner's mortgage or other Property debts or obligations, and the costs of collection of rents as set forth above, including reasonable attorney's fees, shall be reimbursed to Developer, together with a management fee of 3% of the total collection amounts, at Developer's sole discretion, from the Project's cash flows with annual interest of the then existing reported banking prime rate, or from payments/distributions due to Owner at the construction loan closing. If collection of rents is permanently or temporarily suspended due to the commencement of eviction proceedings, and if said suspension of rent collection causes a non-payment of property expenses on the part of the Owner, said shall not be considered an event of default under this agreement, and interest shall not accrue; and

  iii. Continue to maintain the Property in a good state of maintenance and repair, and to collect ongoing rents for the Property.

2. **MEETINGS AND REPORTING**.

  a. **Reporting**. The Parties are required to report to each other on the performance of

4

FILED: BRONX COUNTY CLERK 07/25/2024 09:26 AM
NYSCEF DOC. NO. 2

INDEX NO. 811722/2024E
RECEIVED NYSCEF: 07/25/2024

24-11350-jpm    Doc 47-1    Filed 07/23/25    Entered 07/23/25 11:57:59    Exhibit a
Pg 6 of 15

their obligations and the status of the Project under this Agreement at monthly intervals, or as reasonably required to ensure the timely progress of the Project.

b. **Meetings**. The Parties are required to participate in in-person or virtual/video conferencing meetings on a quarterly basis to discuss the finances and progress of the Project, and make decisions with respect to the Project. The Parties shall establish a shared drive for access to books and records of the Project, including the Project's plans, specifications, reports, applications and financial documentation.

c. **Accounts**. Developer shall maintain all accounts related to the Project in federally insured banking institutions of Developer's choice and shall make account statements available to Owner for inspection promptly upon Owner's reasonable request.

3. **FORMATION OF JOINT VENTURE DEVELOPMENT ENTITY**. Within thirty (30) days of the date hereof, Developer shall cause the formation of Karson Housing II LLC as a New York or Delaware limited liability company (the "**SPE**"). The SPE shall be comprised of **Karson** (or such other special purpose entity fully owned by Ivan Diaz), and **Changar**. The SPE shall serve as the ultimate developer and manager of the ultimate owner of the Project. The Parties agree that the terms of this Agreement shall serve as the initial operating agreement for the SPE, with a more detailed operating agreement to be negotiated in good faith between the Parties upon the acquisition and construction financing for the Project, and until such time this shall be the operative agreement between the Parties.

   a. **Ownership Percentages and Allocation of Profits and Losses**.

      i. **Ownership Percentages**

         a) Upon the acquisition of the Property by the SPE, Owner shall retain One percent (1%) equity stake in the SPE.

         b) Upon the acquisition of the Property by the SPE, Developer shall have ninety-nine percent (99%) equity stake in the SPE.

      ii. **Economic Interest; Profit and Losses**

         a) To maximize the funding and potential tax credit allocation for the Project, the Parties intend to organize the Project under a condominium structure with a residential Condominium Unit, and a community facility Condominium Unit suitable for market leasing in accordance with the Agency requirements. Developer shall have 100% ownership interest in the residential Condominium Unit, and receive 100% of the net profits from the residential Condominium Unit and the Project, except for the net profits allocated to Owner pursuant to subsection (b) below.

5

    b) Upon the completion of the Project and the Project's permanent financing conversion, Owner shall be deeded the community facility Condominium Unit, of approximately 3,750.00 gross square ft. Owner shall then be receive 100% of the net profits allocated to the community facility Condominium Unit.

    c) Any losses shall be allocated between the Parties in the same proportion as the Ownership percentages held by the Parties in the SPE. Notwithstanding the foregoing, all real estate deductions computed for federal income tax purposes shall be allocated to Developer.

  iii. **Developer Fee**. Depending on the financing structure of the Project, it may be possible to obtain a developer fee of approximately 10-15% of the Project's final budget. The paid in Developer Fee and construction profits shall be allocated solely to Developer.

b. **Payment of Cash Flow**.

  i. Project cash flows shall first be used to repay Developer for any pre-development loans or other advances that have not been previously reimbursed under the development budget on a pro rata basis. Any remaining cash flow after payment of advances shall be allocated as follows: (i) 100% of cash flows to Developer stemming from the residential condominium Unit; and (ii) 100% cash flows to Owner stemming from the community facility/retail condominium unit.

c. **Management**.

  i. Developer shall be the Managing Member of the SPE and shall make all decisions with respect to the Project = with the exception of "Major Decisions," as set forth below. The SPE shall be the managing member of the ultimate owner or beneficial owner of the Project For purposes of this Agreement, "Major Decisions" shall include: (i) winding down and dissolution of the SPE; (ii) the merger of the SPE with another entity, (iii) the admission of new members to the SPE, and (iv) the removal of a member of the SPE, all of which must be approved by unanimous consent. Notwithstanding the anything contained herein, in order to maximize tax and recording savings and/or to participate in government funding for the Project, the Parties agree and understand that the Project may require the participation of a 501(c)(3) qualified non-profit entity either as an operating provider of services, or as part of the fee owner or beneficial owner of the Project, and the fee ownership of the Project may be required to be held in the name of non-profit Housing Development Corporation. For purposes of this subsection (c)(i), such transfer or assignment of interest of the Parties shall not be considered a merger, or admission of new members to the SPE. In no event, however, shall such transfer or assignment of interest shall cause the removal of Owner or the dilution of Owner's equity percentage or economic interest in the

Project.

## 4. PROJECT CONTRACTS AND OBLIGATIONS.

a. **Development Expenses; 10% Carryover.** The Parties contemplate that Developer will advance all development expenses reasonably necessary to develop the Project, including funds to meet the 10% carryover test required by the LIHTC program to the extent such funds are not available under a construction loan for the Project; and further provided that the Project seeks LIHTC as part of the financing structure for the Project.

b. **Guaranties.** Developer or a fee General Contractor with sufficient bonding capacity to secure the Project shall provide all guarantees required to complete the development of the Project.

c. **Dilution.** Notwithstanding anything to the contrary contained in this Agreement, the Parties expressly agree that any dilution that the Parties may have to accept to reduce their equity interest from in the Project as a result of funds that will be required whether from debt, equity, mezzanine, construction or any other financing, the Parties will remain *parri passu* to their respective interests. Any funding that one party secures or arranges for the joint venture on behalf of the other Party, said amount shall become a Member loan paid as a priority to the "lending member."

## 5. COMMENCEMENT AND TERM.

a. **Term.** The term of this Agreement shall begin on the date first set forth above, and shall remain in full force and effect until completion of construction for the Project or unless extended by mutual agreement of the Parties.

b. **Termination.**

  i. If Developer becomes insolvent, declares bankruptcy, is subject to a change of control, materially breach of this Agreement, and fails to cure such breach within ninety (90) days after written notice (or such longer period as shall be commercially reasonable provided that Developer shall take diligent efforts to cure), Owner may, but shall not be obligated to terminate this Agreement upon thirty (30) days' written notice to Developer, and any sums advanced by Developer shall not be refundable by Owner.

  ii. If Owner becomes insolvent, declares bankruptcy, is subject to a change of control, makes any false or material representation in connection with this Agreement or the Project, transfers the Property or Owner's interest in the Property to a third party, or any of the Property's development rights, or materially breaches this Agreement, and fails to cure such breach within thirty (30) days after written notice (or such longer period as shall be commercially reasonable provided that Owner shall take diligent efforts to cure), Developer shall be entitled to terminate this Agreement upon Ten (10) day's written notice to Owner; provided however, that Developer shall reserve any and all claims to

7

FILED: BRONX COUNTY CLERK 07/25/2024 09:26 AM
NYSCEF DOC. NO. 2
24-11350-jpm    Doc 47-1    Filed 07/23/25    Entered 07/23/25 11:57:59    Exhibit a
Pg 9 of 15
INDEX NO. 811722/2024E
RECEIVED NYSCEF: 07/25/2024

payment and reimbursement of any sums advanced in connection with the Project as provided by this Agreement, including but not limited to Developer's costs, expenses and reasonable legal fees accrued by Developer in connection with Owner's default.

c. **Intentionally Deleted.**

d. **Limitation on Scope of Liability.** The obligations of the Parties hereunder are binding only on the Parties to this Agreement and shall not be personally binding upon, nor shall any resort be had to, any other assets of any of the partners, officers, directors, members, managers, shareholders or beneficiaries of any Party, or of any employees or agents of any Party.

6. **EXCLUSIVITY.** Owner agrees that it shall work exclusively with Developer in furtherance of the Project. During the Term of this Agreement, Owner shall not market or advertise, nor lease or sale any interest in the Property to any third parties. Failure to comply with this Section 6 shall be a material breach of this Agreement.

7. **GOVERNING LAW AND JURISDICTION.**

   a. **Governing Law.** This Agreement is, and all negotiations and any legal agreements prepared in connection with the joint venture, and any dispute or claim arising out of or in connection with them or their formation shall be governed by, and construed in accordance with the laws of the State of New York.

   b. **Jurisdiction.** The Parties irrevocably agree that a court of competent jurisdiction of the State of New York, County of Bronx, shall have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this Agreement and negotiations relating to the proposed joint venture or their subject matter or formation.

   c. **Mediation Clause.** Unless expressly prohibited by law, any dispute, controversy, claim or cause of action arising between or among the Parties, including those arising out of or relating to this Agreement or any related agreements will be determined by binding Arbitration. The Parties agree arbitrate through a program approved by the American Arbitration Association before a single Arbitrator with a minimum of 10 years of experience in the field of real estate development and commercial litigation. A arbitration award shall be final amongst the Parties. A Judgment upon the Arbitration award may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional remedy will not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to mediation if any other party contests such action for judicial relief. The exercise of a remedy does not waive the right of either party to resort to mediation. The prevailing party in the Arbitration proceeding shall be entitled to the recoupment of its reasonable legal fees. For purposes of this Agreement, "prevailing party" shall refer to the successful party in the Arbitration after the entry of a final arbitration judgment and award, or

the party enjoying the successful benefit of a settlement in the arbitration proceeding.

## 8. REPRESENTATIONS.

a. Each Party represents and warrants that no conflict of interest exists or is anticipated relevant to its role in this Agreement or the Project. If a conflict of interest arises, the Party affected will notify the other Party immediately and the Parties will seek to resolve the conflict to ensure that the successful performance of the Projects is not jeopardized

b. Each Party represents and warrants that it has not been debarred from any housing-related assistance program by any federal agency.

c. Owner represents that it is the sole fee title Owner of the Property; that it has not entered into any other Agreements with any other parties to sale, lease, or develop the Property, or given any other Party any rights with respect to the Property, other than the existing commercial leases and tenancies at the Property; that the commercial tenants at the Premises do not have any options to purchase or renew their leases, or they occupy the Property on a monthly hiring; and that to its best knowledge, it has not caused or permitted any hazardous materials to be used, stored, discharged, released or disposed of in the Property, the land or improvement thereon.

## 9. CONFIDENTIALITY.

a. **Disclosure of Confidential Information**. "Confidential Information" means all confidential, non-public or proprietary information regardless of how the information is stored or delivered, exchanged between the Parties before, on, or after the date of this Agreement relating to the business, technology, or other affairs of any Party. No Confidential Information may be disclosed by either Party to any person except:

   i. Representatives of the recipient of the Confidential Information or its related entities requiring the information for the purposes of this Agreement; or

   ii. With the consent of the Party who supplied the information which consent may be given or withheld in its absolute discretion; or

   iii. If either Party is required to do so by law; or

   iv. If either Party is required to do so in connection with legal proceedings related to this Agreement; or

   v. To either Parties' legal representatives or accountants; or

   vi. Developer or Owner may disclose Confidential Information to lenders or equity partners who may participate in any Projects.

9

Notwithstanding the foregoing, Confidential Information shall not include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by the disclosing party; (ii) becomes publicly known and made generally available after disclosure by the disclosing party to the recipient through no action or inaction of the recipient; (iii) is already in the possession of the recipient at the time of disclosure by the disclosing party as shown by the recipient's files and records immediately prior to the time of disclosure, or as demonstrated by other competent evidence; (iv) is obtained by the recipient from a third party without a breach of the recipient's obligations of confidentiality; (v) is independently developed by the recipient without use of or reference to the disclosing party's Confidential Information, as shown by documents and other competent evidence in the recipient's possession; or (vi) is required by law to be disclosed by the recipient, provided that the recipient gives the disclosing party prompt written notice of such requirement prior to such disclosure and assistance in obtaining an order protecting the information from public disclosure, such assistance shall be at the disclosing party's expense.

b. **Use of Confidential Information**. A party who has received Confidential Information from another under this Agreement must not use it except for the purpose of exercising its rights or performing its obligations under this Agreement.

c. **Return of Confidential Information**. A Party who has received Confidential Information from another under this Agreement must, on the request of the other Party, immediately deliver to that Party all documents or other materials containing or referring to that information which are in its possession, power, or control in the possession, power, or control of persons who have received Confidential Information from it under this Section.

d. **Termination**. This Section 9 ("Confidentiality") shall survive termination (for whatever reason) of this Agreement, and is legally binding and enforceable.

10. **GENERAL**.

    a. **Variation and Waiver**. A provision of this Agreement or a right created under it, may not be waived or varied except in writing (signed or duly executed) by the Party or Parties to be bound.

    b. **Notices**. All notices provided or permitted to be given under this Agreement must be in writing and may be served by depositing same in the United States mail, addressed to the party to be notified, postage prepaid and registered or certified with return receipt requested, by delivering the same in person to such party, by prepaid telegram or telex, or by facsimile copy transmission or email with proof of delivery. Notice given in accordance herewith shall be effective upon receipt at the address of the addressee. For purposes of notice, the addresses of the parties shall be as follows:

10

If to Owner to:

Changar Realty Corp
1704 Dr. Martin Luther King Jr. Blvd, First Floor
Bronx, N.Y. 10453
Attn: Carlos Garcia

Courtesy Copy to:
Tarik Davis, Esq.
E: Tdavis@dnislaw.com

.If to Developer to:

Diaz & Associates Realty, Inc.
8 Duck Pond Road,
Alpine, NJ 07620
Attn: Ivan Diaz
E: idiaz@diazandassoc.com

Courtesy Copy to:
Juan C. Restrepo, Esq.
E: Juan@Rlawpartners.com
cc': Reggie@Rlawpartners.com

Either party hereto may change its address for notice by giving three (3) days prior written notice thereof to the other party.

c. **Counterparts; Electronic Signature**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Either or all parties may execute this Agreement by facsimile signature or scanned signature in PDF format, or electronic signature, and any such signature, shall be deemed an original signature and each of the parties is hereby authorized to rely thereon.

d. **Property Insurance/Condemnation**. Up and until the transfer of title to the Property to the ultimate Owner of the Property, Owner shall continue to maintain all insurance policies for the Property which are currently in effect, and add Developer as an "additional insured". If the Property is totally or partially destroyed by fire or other casualty or if the Property is taken or threatened to be taken in condemnation or under the right of eminent domain ("Casualty Loss"), Developer shall not be obligated to acquire the Property, and may terminate this Agreement without any further obligation or liability assumed by either Party. If Developer elects to continue to acquire the Property after a Casualty Loss, any

11

insurance proceeds or compensation which shall be payable or advanced to Owner, up to the allocated value thereof (the reduction being the "Net Casualty Loss"), shall be allocated towards Owner's cash consideration payable by Developer hereto to Owner, or at Developer's sole discretion, towards other Project sources of expenses.

e. **Costs**. Each Party is responsible for their own costs and expenses in connection with the negotiation and preparation of this Agreement and completion of any related documents.

f. **Entire Agreement**. This Agreement constitutes the entire agreement of the Parties about its subject matter and supersedes all previous agreements, understandings, and negotiations of that subject matter.

g. **Attorneys' Fees**. The prevailing party in any legal proceeding brought under or with relation to this Agreement or transaction shall be entitled to its reasonable attorneys' fees, and all other litigation expenses from the non-prevailing parties.

h. **Attorney in Fact**. With respect to the management of the Project, and without limiting any rights or powers granted by this Agreement upon the occurrence and during the continuance of any event of default by Owner, Developer is hereby appointed the attorney-in-fact of the Owner and the SPE for the purpose of carrying out the provisions of this Agreement, and taking any action and executing any instruments which the Developer may deem necessary or advisable to accomplish the purposes hereof, which appointment as attorney-in-fact is irrevocable and coupled with an interest.

i. **Severability**. In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision is severed and deleted from this Agreement.

j. **Cooperation and Good Faith**. The Parties agree to cooperate and act in good faith in carrying out each of its respective obligations hereunder, including the preparation and filing of any notices, disclosures, reports or other documents that may be necessary to the consummation of the transaction contemplated by this Agreement.

*THE SIGNATURE PAGES IMMEDIATELY FOLLOW.*

FILED: BRONX COUNTY CLERK 07/25/2024 09:26 AM
NYSCEF DOC. NO. 2
24-11350-jpm    Doc 47-1    Filed 07/23/25    Entered 07/23/25 11:57:59    Exhibit a
Pg 14 of 15
INDEX NO. 811722/2024E
RECEIVED NYSCEF: 07/25/2024

**IN WITNESS WHEREOF**, Owner has executed multiple counterparts of this Agreement as of the date first written above in this Agreement.

CHANGAR REALTY CORP.

By: _____
Name: ~~Elba Torres~~ Elba Fournier
Title: ~~Owner~~
Dated: 03/17/2023

_____
Carlos Garcia
President
03/17/2023

13

FILED: BRONX COUNTY CLERK 07/25/2024 09:26 AM
NYSCEF DOC. NO. 2
INDEX NO. 811722/2024E
RECEIVED NYSCEF: 07/25/2024

24-11350-jpm    Doc 47-1    Filed 07/23/25    Entered 07/23/25 11:57:59    Exhibit a
Pg 15 of 15

IN WITNESS WHEREOF, Developer has executed multiple counterparts of this Agreement as of the date first written above in this Agreement.

DIAZ & ASSOCIATES REALTY, INC.

By: _____Ivan Diaz_____
Name: Ivan Diaz
Title: Authorized Signatory
Dated: 3/17/23