**ANDERSON, BOWMAN, & WALLSHEIN, PLLC**
Btzalel Hirschhorn, Esq.
8002 Kew Gardens, Suite 600
Kew Gardens, NY 11415
Tel: (718) 263-6800
Fax: (718) 520-9401
Email: Bhirschhorn@abwpllc.com

*Counsel to Creditor Diaz & Associates Realty Inc.*

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN **DISTRICT OF NEW YORK**

| | |
|---|---|
| ---------------------------------------------------------------X | Chapter 11 |
| In re: | Case No. 24-11350 |
| CHANGAR REALTY CORP, | |
| Debtor, | |
| ---------------------------------------------------------------X | |

**<u>MEMORANDUM OF LAW IN OPPOSITION TO DEBTOR'S MOTION TO SELL THE REAL PROPERTY AT 1704-1714 UNIVERSITY AVENUE, BRONX NY FREE AND CLEAR OF ALL CLAIMS</u>**

**Btzalel Hirschhorn, Esq.,** an attorney duly licensed to practice law before the Courts of this State and before the Courts of the Eastern District of New York, respectfully submits this memorandum of law on behalf of creditor Diaz & Associates Realty Inc., ("Diaz") in opposition to the Debtor's motion for an order approving the sale of the real property located at 1704-1714 University Ave., Bronx, NY ("Subject Property"), to Montreal Star Corp. free and clear of all claims.

**<u>FACTUAL & PROCEDURAL BACKGROUND</u>**

1. On or about March 17, 2023, Diaz and the Debtor entered a joint venture agreement ("JV Agreement") where Diaz agreed to develop the Subject Property and the Debtor agreed it would convey the Subject Property to a special purpose entity ("SPE") that would be jointly owned

by Karson Housing II, LLC, or another entity owned by Diaz, and the Debtor. A copy of the JV is annexed hereto at Exhibit A.

2. After the Debtor signed the JV, Diaz spent considerable funds towards the development of the Subject Property. This included but was not limited to 1) hiring and consulting an architect, 2) providing money to the Debtor that was specifically designated for the Debtor to pay the mortgage, and 3) payment of legal fees for legal services associated with the purchase and development of the Subject Property.

3. On July 25, 2024, after the Debtor misappropriated the funds that had been earmarked for the mortgage and failed to close, Diaz was forced to commence an action against the Debtor in Bronx County Supreme Court under index no. 811722/2024E ("State Court Action").

4. On August 5, 2024, without even filing an answer, the Debtor filed the instant bankruptcy proceeding thus staying the State Court Action.

5. Despite being out of pocket for all these costs, when the Debtor filed the instant bankruptcy, Diaz did not wish to engage in protracted litigation and was cognizant of the Debtor's desire to reorganize. Diaz simply wanted to purchase the Subject Property and began engaging with Debtor's counsel to enter a stalking horse agreement. Debtor's counsel insisted though that the Debtor would not do a private sale and any offer from Diaz would have to be in the form of a stalking horse subject to higher and better offers and a formal auction. (See emails attached as Exhibit B).

6. On March 17, 2025, Diaz, in conjunction with Itzhaki Acquisitions (an investor Diaz has partnered with in connection with the acquisition), sent the Debtor a formal offer to purchase the Subject Property for $3,900,000. (See Exhibit C). The Debtor insisted on a cash deal which Diaz agreed to. The Debtor insisted on proof of funds which Diaz likewise agreed to. Diaz

(through counsel) also sent proof of funds by email to Debtor's counsel on April 11, 2025. On April 24, 2025, Debtor's counsel emailed the undersigned that she would review Diaz's submissions.

7. After another month went by with no response from the Debtor until the filing of its May 27, 2025, status report, where for the first time, the Debtor suddenly expressed a desire to pursue a private sale – contrary to the multitude of representations that had previously been made. The Debtor also admitted in its status report that the proposed sale "would not be sufficient to satisfy all other creditors." [¶10]. On its face, any plan to sell an asset at a private sale that would not pay off all creditors would be patently unconfirmable. It would also fail the best interests of the creditors test as it would deprive the creditors of the opportunity to see if a public auction would yield a higher distribution.

8. Finally, on June 25, 2025, the Debtor filed a motion seeking to sell the Subject Property at a private sale ("Sale Motion"). The Sale Motion raises several troubling concerns – chief among them that it a) runs directly contrary to the representations made by the Debtor that it would not conduct a private sale; and b) even more fundamentally, the Sale Motion attempts to improperly sell the Subject Property free and clear of the JV Agreement although the Debtor failed to even list the JV on its schedules and has taken no action to reject the JV Agreement.

9. For these reasons and as will be detailed further below, the Debtor's Sale Motion must be denied.

**DISCUSSION**

*A. The Debtor has failed to properly assume or reject the JV*

10. Rule 6006(a) of the Federal Rules of Bankruptcy Procedure provides that proceedings to assume, reject, or assign an executory or unexpired lease, other than as part of a plan are governed by Rule 9014.

11. Rule 9014 in turn provides that "[i]n a contested matter not otherwise governed by these rules relief must be requested by motion. Reasonable notice and an opportunity to be heard must be given to the party against whom relief is sought."

12. 11 U.S.C. §365 provides in pertinent part that "the trustee, *subject to the court's approval*, may assume or reject any executory contract or unexpired lease of the debtor." (emphasis added).

13. The Second Circuit has characterized an executory contract as one "on which performance remains due to some extent on both sides …." In re Times Square JV LLC, 648 B.R. 277, 284 (Bankr. S.D.N.Y. 2023). Further, "courts use a business judgment standard when evaluating whether to permit a debtor to assumer or reject a contract." Id. (internal quotations omitted).

14. Here, the Debtor seeks to sell the Subject Property free and clear of liens, claims, encumbrances and other interests. Ostensibly it would appear that the Debtor is also seeking to sell free and clear of the JV Agreement. The Debtor though fails to list the JV Agreement in its motion and has failed to take any action to reject or assume the JV Agreement, and has likewise failed to even list the existence of the JV Agreement on its schedule G.

15. The JV Agreement is unquestionably an executory contract as it specifically requires future performance from both parties. Page two section 1(a) entitled 'Developers

Obligations' lays out a list of performance actions required on the part of Diaz and page 4 section 1(b) has a section entitled 'Owner Obligations' with a list of performance actions required by the Debtor.

16. The Debtor's sale motion does not lay out any of the appropriate standards for assumption or rejection – as expressly required under the Bankruptcy Code. Nevertheless, Diaz would support an assumption that accurately reflects the actual terms of the JV Agreement and properly accounts for and credits all funds already expended by Diaz. If the Debtor seeks to sell the Subject Property free and clear of the JV Agreement, this would constitute a functional rejection of the JV Agreement. The Debtor has failed to establish a prima facie case for such rejection.

*B. The Sale Motion Does Not Satisfy §363*

a. Good Faith

17. The Second Circuit has held that "when collusion occurs between a debtor, creditors and a successful bidder, the unsuccessful bidder may be the only party with an interest in exposing such inequitable conduct." Brown Media Corp. v. K&L Gates, LLP, 854 F.3d 150, 159 (2d Cir. 2017).

18. Here, the Debtor contends that the "Contract is the result of extended arm's-length, good faith negotiations between the Debtor and the Buyer, each represented by their respective counsel." See Status Rep. ¶34. However, there are many concerning facts that raise red flags regarding nature of this contract.

19. First, the Debtor admits that it initially sought to retain Maltz Auctions but later retracted in order to conduct a private sale to a buyer that "has been known to the Debtor for some time." See Sale Mot. ¶16. The Debtor fails to disclose the nature of this relationship. To ensure

there are no conflicts of interest or self-dealing, it is incumbent upon the Debtor to disclose the precise nature of its relationship to this buyer.

20. Next, the buyer is listed simply as "MONTREAL STAR CORP. OR A SINGLE PURPOSE ENTITY FORMED BY PURCHASER FOR THIS ACQUISITION." The name of the individual who signed on behalf of the proposed buyer, although handwritten and blurry, appears to read simply 'B. Makakian' with the full first name not disclosed.

21. Third, the contract is not dated. This raises concerns about when the Debtor decided to suddenly switch from an auction to a private sale.

22. Fourth, the Debtor also fails to disclose that that Diaz had sent an offer for $3.9 million in March 2025. The Debtor fails to disclose that it repeatedly told Diaz that it would not do a private sale and insisted for months that the Subject Property could only be sold by auction.

23. The Contract on its face also has several deficiencies: a) it does not list the name of the buyer's attorney (even though the Sale Motion asserts that the Contract was negotiated with counsel on both sides); b) it is not signed by the Debtor's principal, and; c) the Rider to the contract is not signed by either the buyer or the seller.

24. The Debtor also fails to disclose whether it had sought or received proof of funds from the buyer as it had from Diaz. The Sale Motion further fails to disclose Diaz's lien pursuant to the JV Agreement. [1]

[1] Page two of the JV provides "With the exception with the non-refundable deposit referenced in above all sums paid to Owner prior to the acquisition of the Property shall be treated as contract deposits by Developer as a contract vendee, and shall become liens against the Property and enforceable as liens against the Property in accordance with law."

b. <u>Montreal Star Corp.'s Offer is Not the Best Offer</u>

25. Aside from myriad of shortcomings detailed above, the Debtor's assertion that it should be entitled to conduct a private sale and not an auction because 'the offer is simply the best offer received' falls woefully short of the appropriate standard. First, the Debtor asserts that "the Property was actively marketed prepetition" (see Sale Mot. ¶ 38) but has failed to provide any evidence of what steps it took to market the Subject Property.

26. Second, the Debtor cannot demonstrate that the offer from Montreal Star Corp is in fact the 'best offer' received. If Diaz's offer were accepted and a sale to Diaz is approved, Diaz would waive any claim for rejection damages that it may otherwise have under 11 U.S.C. §365(g). [2] If however the JV were rejected, Diaz would have a claim in a yet to be determined amount. Given the funds Diaz has already expended on a) giving money to the Debtor pre-petition, b) hiring architects, and c) legal fees associated with the JV Agreement, Diaz's rejection damages would easily surpass $50,000. If Diaz's offer was accepted this would yield the estate at minimum a $50,000 discount. The Debtor has failed to account to the benefit the estate would thus yield in the event the Diaz's offer was accepted. Diaz's rejection damages claim also completely dispels the Debtor's notion that "the only entity that could possibly be impacted by a higher price is the Debtor." See Sale Mot. ¶38.

27. Finally, the Debtor claims that a private sale should be approved over an auction because "sufficient notice of the Sale will be provided through notice of this motion." See <u>Id</u>. Notice of a motion though is simply not the same as an auction and the associated publication requirements that accompany an auction. Undoubtedly an auction provides far greater reach to

[2] Diaz has not yet filed a proof of claim because its claim is dependent on whether the Debtor elects to assume or reject its executory contract. To date the Debtor has failed to take any action one way or the other to either assume or reject. Although the general bar date has passed, no bar date has been set for claims arising from rejection damages.

potential purchasers than a mere notice of motion. The Debtor's attempts to equate the two are unfounded.

28. Accordingly, on for all the above reasons, the Debtor's motion must be denied.

## CONCLUSION

29. In sum, the Debtor's Sale Motion improperly attempts to sell the Subject Property free and clear of the JV Agreement, yet the Debtor never went through the proper rejection procedures. The Debtor's Sale Motion also fails to make proper disclosures, is riddled with deficiencies, and falls woefully short of meeting the §363 standards.

**WHEREFORE**, Diaz respectfully request that this Court:

a) Enter an order **DENYING** the Debtor's Motion; and

b) For such other and further relief as the Court deems just and proper.

Dated: July 23, 2025
Kew Gardens, NY

Respectfully submitted,

**ANDERSON, BOWMAN, & WALLSHEIN, PLLC**

*/s/ Btzalel Hirschhorn*
Btzalel Hirschhorn, Esq.
*Counsel for Creditor Diaz & Associates Realty, Inc.*
80-02 Kew Gardens, Rd., Ste. 600
Kew Gardens, NY, 11415
(718) 263-6800 (Telephone)
(718) 520-9401(Facsimile)
Bhirschhorn@abwpllc.com